# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SHAUN PARKER GAZZARA, ANA
PAULA GAZZARA, HARRY JAMES
WHITMAN and MARCIA FAYE
WHITMAN,

          **Plaintiffs,**

v.                                                  **Case No:   6:16-cv-657-Orl-31TBS**

PULTE HOME CORPORATION,

          **Defendant.**

_____

## ORDER

      This matter comes before the Court on the Motion to Exclude the Testimony of Thomas E. Miller (Doc. 167) filed by the Defendant, Pulte Home Corporation (henceforth, "Pulte"), the Memorandum in Opposition (Doc. 177) filed by the Plaintiffs, and the reply (Doc. 184) filed by Pulte.

### I.      Background

      According to the allegations of the Second Amended Complaint (Doc. 107), the Plaintiffs in this putative class action are married couples who own houses in Orange County, Florida that were constructed by Pulte.   The Plaintiffs contend that Pulte violated two provisions of the Florida Building Code when installing their homes' stucco siding, and that the siding is now cracking as a result.   (Doc. 107 at 15).

      In Count I[1] of the Second Amended Complaint, the Plaintiffs assert a claim pursuant to Florida Statute § 553.84, which provides a cause of action for anyone damaged as a result of a

_____

[1] The Second Amended Complaint originally contained two counts, but Count II was

violation of the Florida Building Code (henceforth, the "Code").[2]   On November 21, 2016, the

Plaintiffs filed a motion (Doc. 143) to certify a class of individuals who own homes built by Pulte

with stucco siding over the past ten years.   They contend that, *inter alia*, "damage and causation

is common throughout the class," Doc. 143 at 6, and that "[r]eplacement of the affected stucco

siding on the home is the common remedy," Doc. 143 at 7.   In support of these contentions, the

Plaintiffs offer the testimony of Thomas E. Miller (henceforth, "Miller,") a civil engineer with

expertise in the installation of stucco.   By way of the instant motion, Pulte seeks to bar Miller's

testimony.

## II.   Legal Standard

### A.   Expert Testimony

Federal Rule of Evidence 702 governs the admission of expert witness testimony.   It

provides that:

---

dismissed on December 12, 2016.   (Doc. 160).

[2] The full text of Fla. Stat. §553.84 reads as follows:

> Notwithstanding any other remedies available, any person or party,
> in an individual capacity or on behalf of a class of persons or parties,
> damaged as a result of a violation of this part or the Florida Building
> Code, has a cause of action in any court of competent jurisdiction
> against the person or party who committed the violation; however, if
> the person or party obtains the required building permits and any
> local government or public agency with authority to enforce the
> Florida Building Code approves the plans, if the construction project
> passes all required inspections under the code, and if there is no
> personal injury or damage to property other than the property that is
> the subject of the permits, plans, and inspections, this section does
> not apply unless the person or party knew or should have known that
> the violation existed.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   The proponent of the opinion testimony has the burden of establishing each precondition to admissibility by a preponderance of the evidence.   *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

In *Daubert v. Merrill Dow*, 509 U.S. 579 (1993), the Supreme Court admonished trial courts to fulfill a gatekeeping role in the presentation of expert testimony.   To guide district courts' assessments of the reliability of an expert's testimony, the Supreme Court identified four factors that district courts should consider: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.   *See id*. at 593–94.   At the same time, the Court has emphasized that these factors are not exhaustive and are intended to be applied in a "flexible" manner.   *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).   District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies the appellation "expert testimony."   *Rink*, 400 F.3d at 1291 (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)).

**B.    Class Actions**

Class actions are governed by Federal Rule of Civil Procedure 23.   Rule 23 provides, in pertinent part, that one or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

> The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23. The Rule does not set forth a mere pleading standard.   Rather, a party must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a).   The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013) (internal citations and quotations omitted).   In the instant case, the provision under which the Plaintiffs seek to proceed is Rule 23(b)(3), which permits a class action to be maintained if Rule 23(a) is satisfied and if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)** the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> **(C)** the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
>
> **(D)** the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147 (1982). "The burden of proof to establish the propriety of class certification rests with the advocate of the class." *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003). When an expert's report or testimony is critical to class certification, a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion. *Sher v. Raytheon Co.*, 419 Fed. Appx. 887, 890 (11th Cir. 2011) (citing *American Honda Motor Co., Inc. v. Allen*, 600 F. 3d 813, 815-16 (7th Cir. 2010)).

> A district court is the gatekeeper. It must determine the reliability of
> the expert's experience and training as well as the methodology
> used. The [district] court must also resolve any challenge to the
> reliability of information provided by an expert if that information is
> relevant to establishing any of the Rule 23 requirements for class
> certification.

*Id.* at 890 (internal citations omitted).

## III.   Analysis

To prevail on a claim under Fla. Stat. § 553.84, a homeowner must show that (1) the homebuilder violated the Florida Building Code in constructing the home, and (2) the plaintiff suffered damage as a result. In the instant case, two provisions of the Code are at issue: ASTM[3]

---

[3] According to its website, ASTM International – formerly known as the American Society for Testing and Materials – is one of the world's largest standards-developing organizations, with more than 30,000 members. *What is ASTM?*, https://www.astm.org/ABOUT/factsheet.html (last

C926, the Standard Specification for Application of Portland Cement-Based Plaster, and ASTM

C1063, the Standard Specification for Installation of Lathing and Furring to Receive Interior and

Exterior Portland Cement-Based Plaster.   The Plaintiffs contend that Pulte violated the Code in at

least one of two specified ways in constructing their homes and those of the remainder of the

putative class.   The first alleged violation is of a provision of ASTM C926 that requires spacing –

to allow for differing rates of thermal expansion and contraction – where stucco would otherwise

abut dissimilar materials such as steel or vinyl.   The second violation involves provisions of

ASTM C1063 that require the installation of control joints[4] to prevent a single section of stucco

from exceeding 144 square feet in area, or 18 feet in length, or a length-to-width ration of 2.5 to

1.[5]

> The Plaintiffs seek to certify the following class:

> > All individuals, corporations, associations, trusts, or other entities
> > that currently own single family detached residences,
> > condominiums, or townhomes (collectively, "homes") constructed
> > by Pulte in Florida between April 18, 2006 and April 18, 2016, with

---

visited March 3, 2017).   ASTM International develops, *inter alia*, standards for construction
practices (including the two at issue in this case), which have been adopted as part of the Florida
Building Code.

[4] In simple terms, a control joint is a metal strip that provides a gap for stucco to expand
and contract while preventing water from penetrating to the remaining components of the house.
ASTM C1063 – 7.11.4 provides that control joints

> > shall be formed by using a single prefabricated member or
> > fabricated by installing casing beads back to back with a flexible
> > barrier membrane behind the casing beads. The separation spacing
> > shall be not less than 1/8 inch or as required by the anticipated
> > thermal exposure range.

[5] While not admitting that it failed to abide by the requirements of ASTM C926 and
ASTM 1063 with regard to spacing and control joints, for present purposes Pulte does not dispute
that such failures would constitute violations of the Code.

> a Drainage Plane Exterior Stucco Wall System over Wood Frame
> and Wood Sheathing ("STUCCO SIDING"), which contains
> dissimilar materials, specifically Portland cement-aggregate plaster
> mix designed for use on exterior surfaces and either steel,
> aluminum, plastic, vinyl, or other inert materials from that of the
> Portland cement-aggregate plaster mix, or contain stucco surfaces
> which are either (a) in excess of one hundred forty-four (144)
> contiguous square feet, or (b) are greater than eighteen (18) linear
> feet in length, or (c) have a surface area with a length to width ratio
> greater than two and one-half (2 ½) to one (1), or both.

(Second Amended Complaint at 2-3) (emphasis in original).   There is some dispute as to the exact

number of homes that would fall within this definition, but it appears that Pulte built more than

17,000 houses with stucco siding during the relevant time frame.   (Doc. 167 at 5).

In support of their allegations, the Plaintiffs offer the expert testimony of Thomas Miller,

who has provided an expert report (Doc. 136-1) (henceforth, the "Miller Report") and a

supplement (Doc. 136-2) (henceforth, the "Miller Supplement").   Miller has extensive experience

with regard to the installation of stucco.   He received a bachelor's degree in civil engineering

from the Florida Institute of Technology in 1994.   (Miller Report at 13).   He has been a

professional engineer since 2001 and is licensed in nine states, including Florida.   (Doc. 193 at 5).

Since 2002, he has been an owner and operator of Structural Engineering and Inspections

(henceforth, "SEI").   (Doc. 193 at 5-6).   SEI focuses on, *inter alia*, inspections and forensic

investigations for homeowners, builders, and insurance companies.   (Doc. 193 at 6).   Since 2008,

an increasing amount of Miller's work at SEI has focused on stucco-related issues.   (Doc. 193 at

6).   He has conducted or overseen hundreds of forensic investigations of single-family and multi-

family dwellings in response to concerns about stucco siding.   (Miller Report at 2).   He is a

member of the ASTM C11 committee, which sets the standards governing stucco installation,

including ASTM C926 and ASTM C1063.   (Doc. 193 at 6-7).

In his original report, dated August 19, 2016, Miller offered the following "Opinions":

1.      I have performed forensic investigations on over 150 homes that meet the Class definition[6] in the state of Florida in response to concerns about STUCCO SIDING.

2.      I have visually observed thousands of homes that meet the Class definition throughout the state of Florida that have been constructed consistent with STUCCO SIDING.

3.      Drainage Plane Exterior Stucco Wall Systems over Wood Frame and Wood Sheathing ("STUCCO SIDING") have common elements, Stucco/Cement Plaster, Lath, Drainage Plane, Wood Framing and Wood Sheathing.

4.      Between May 1, 2006 and April 15, 2016 Pulte in Florida constructed thousands of homes with a Drainage Plane Exterior Stucco Wall Systems over Wood Frame and Wood Sheathing ("STUCCO SIDING") where the STUCCO SIDING has failed.

5.      The predominant and typical reason for the STUCCO SIDING failure for parties in the Class is that Pulte wrongfully constructed those homes in violation of the Code, and there are no other causes.

6.      Cracking in the exterior stucco surface as the result of a violation of the Code is foreseeable.

7.      Cracking in the exterior stucco surface as the result of a violation is a failure.

---

[6] The class was defined differently in Miller's original report.   Specifically, it was defined as:

> All individuals, corporations, associations, trusts or other entities that currently own homes constructed by Pulte in Florida between May 1, 2006 and April 15, 2016 with a Drainage Plane Exterior Stucco Wall System over Wood Frame and Wood Sheathing ("STUCCO SIDING") which Pulte wrongfully constructed in violation of the Florida Building Code ("Code") resulting in the STUCCO SIDING failing.

(Miller Report at 2) (emphasis in original).   Note that his reference to violations of the Code includes the entire Code and not just the two provisions at issue.

8.      A person in the Class can self-identify if the STUCCO
SIDING has failed on their home and therefore the failure was due
to Code violation.

(Miller Report at 6) (capitalization in original).

In addition to the preceding eight items, Miller includes a section in his original report of

"Additional Factors which Substantiate My Findings".   (Miller Report at 8).   Despite the label, a

number of these "Additional Factors" are actually opinions, including the following:

2.      A Code-compliant STUCCO SIDING system will last the
intended life of a home.

**3.**      Failure to follow the Code and the manufacturer's
specifications and installation instructions for STUCCO SIDING
will result in cracking/failure of the STUCCO SIDING.

…

27.      Failure to isolate the stucco/plaster from dissimilar
construction materials or openings contributes to cracking.

28.      Based on visual observations that have been completed on
the homes that meet the Class definition, the damages observed are
consistent with a construction practice that did not isolate the
exterior plaster/stucco from dissimilar construction materials or
openings.

…

39.      Hundreds of homes that meet the Class definition that I have
visually observed throughout the state of Florida do not have the
control joints installed per Code.

40.      Failure to construct/install control joints in accordance with
Code contributes to cracking as a result of normal expansion,
contraction/movement.

…

42.      Based on visual observations that have been completed on
the homes that meet the Class definition, the damage observed is
consistent with the control joints not being installed correctly.

43.      A person in the Class can identify if the control joints at least
in part were installed correctly at their home.

…

52.    Based on intrusive and visual observations that have been completed on the homes that meet the Class definition, the damage observed is consistent with the lath not being completely embedded in the stucco.

…

55.    Based on intrusive and visual observations that have been completed on the homes that meet the Class definition, the damages observed are consistent with the stucco not being the proper thickness.

…

67.    The failures I observed in the STUCCO SIDING at the homes in the Class are consistent with improper curing.

…

69.    Based on intrusive testing and visual observations that have been completed on the homes that meet the Class definition, lack of maintenance is NOT the proximate cause for the damages.

70.    Pulte has harmed and continues to harm the members of the Class because it installed STUCCO SIDING in violation of the Code.   In fact, of the thousands of homes in the Class that I observed, 100% contain Code violations concerning STUCCO SIDING.

(Miller Report at 7-11) (emphasis in original).[7]

In his supplemental report, Miller utilized the more restricted class definition set forth in the Second Amended Complaint (and in the second paragraph of Section III of this opinion).   He stated that, between June 16, 2016 and October 21, 2016, he and other SEI representatives visited 65 of the 94 communities in which, he believed, Pulte built homes with stucco siding during the relevant time frame.   (Miller Supplement at 2-3).   While in each such community, Miller and the

---

[7]   The Court notes that the various alleged Code violations merely "contribute" to cracking, but a "contribution" is not necessarily the proximate cause thereof.   And, the damages observed by Miller are only "consistent with" a Code violation, not necessarily caused thereby.

other SEI representatives conducted visual inspections of at least three Pulte-built homes with

stucco siding, looking for Code violations and stucco cracks, but did not conduct destructive

testing.   The supplemental report includes, *inter alia*, the following additional opinions:

> 2.      The Stucco homes in the Class had at least a portion of the
> home with a Drainage Plane Exterior Stucco Wall System over
> Wood Frame and Wood Sheathing which contains dissimilar
> materials, specifically Portland cement-aggregate plaster mix
> designed for use on exterior surfaces and either steel, aluminum,
> plastic, vinyl, or other inert materials from that of the Portland
> cement-aggregate plaster mix, or contain stucco surfaces which are
> either (a) in excess of one hundred forty-four (144) contiguous
> square feet, or (b) are greater than eighteen (18) linear feet in length,
> or (c) have a surface area with a length to width ratio greater than
> two and one-half (2 1/2) to one (1), or both.

> 3.      In one, two or three story Stucco homes in the Class, it is
> readily observable by an owner or layperson if there is Stucco
> Siding over a gable end that contains dissimilar materials,
> specifically Portland cement-aggregate plaster mix designed for use
> on exterior surfaces and either steel, aluminum, plastic, vinyl, or
> other inert materials from that of the Portland cement-aggregate
> plaster mix, or contain stucco surfaces which are either (a) in excess
> of one hundred forty-four (144) contiguous square feet, or (b) are
> greater than eighteen (18) linear feet in length, or (c) have a surface
> area with a length to width ratio greater than two and one-half (2
> 1/2) to one (1), or both.

> 4.      Stucco that abuts (is in contact with) a dissimilar material
> within "Stucco Siding" is a Code violation.

> 5.      Stucco surfaces which are either (a) in excess of one hundred
> forty-four (144) contiguous square feet, or (b) are greater than
> eighteen (18) linear feet in length, or (c) have a surface area with a
> length to width ratio greater than two and one-half (2 1/2) as part of
> "Stucco Siding" is a Code violation.

> 6.      Not installing "Stucco Siding" in accordance with ASTM
> C926 and C1063 is a Code Violation.

> 7.      The Code Violations listed in 4 and 5 above and resulting
> damage are readily observable by an owner or layperson.

> 8.      Visible cracking in "Stucco Siding" is the result of a
> violation of the Code.

9.      Visible cracking of the "Stucco Siding" is damage.

…

13.      It appears that 243 out of a total number of 296 Pulte Homes that SEI observed met the Class Definition.

…

15.      All the Stucco Siding frame and frame over block homes that SEI observed that have Stucco Siding in contact with windows as the dissimilar material, and that have damage shall have the stucco over frame sections removed and replaced per the repair protocol set forth in Exhibit A of the Second Amended Complaint.

16.      All of the 296[8] homes which SEI observed that meet the class definition and which were damaged, (and the vast majority were damaged) were damaged as a result of Code violations listed in the Second Amended Complaint.

17.      An owner or layperson can readily observe damage caused by Code violations.

(Miller Supplement at 2-3).

Miller's testimony is offered to support the Plaintiffs' theories regarding causation and the appropriate remedy.[9]   Each is discussed below.   Before addressing the substance of Miller's opinions, however, the Plaintiffs argue that any potential *Daubert* challenge has been waived because Pulte filed Miller's report and sworn testimony.   (Doc. 177 at 2-5).   While it is true that

---

[8]  Given that Miller states *supra* that SEI only observed 243 homes that met the class definition, this appears to be a typographical error and should instead read "243".

[9]  In his original report, Miller opines that members of the putative class can identify whether the stucco on their home has cracked (Miller Report at 6) and whether the control joints were correctly installed (Miller Report at 9).   In his supplemental report, he asserts that each of the Code violations at issue here "are readily observable by an owner or layperson" (Miller Supplement at 2) and that an owner or layperson "can readily observe damage caused by Code violations" (Miller Supplement at 3).   While Miller certainly is a stucco installation expert, he has no particular expertise regarding what laypeople are able to observe and understand about stucco installation.   He therefore is not qualified to render an opinion on these points.

a party is generally not free to introduce evidence for one purpose and then disavow it for another, such was not the case here.   The Plaintiffs first attached Miller's report to their class certification motion (Doc. 143) and relied on it in arguing for certification; Pulte included Miller's report and deposition in their response (Doc. 161) to that motion, but only to attack them.   There was no waiver.

### A.      Causation

In his supplemental report, Miller opines that 243 out of 296 Pulte-built homes that he and others at SEI observed had at least one of the two Code violations at issue; that the "vast majority" of those 243 had damage (which he defines as "visible cracking" of the stucco siding), and that this damage was caused by a violation of the Code.   However, the scientific basis for these opinions is woefully lacking.

For purposes of the Plaintiffs' case, the most important testimony that Miller seeks to offer is his opinion that visible cracking in stucco siding of Pulte-built homes resulted from one of the specified Code violations.   (Miller Supplement at 3).   In his deposition, Miller qualified this opinion, stating that such cracks resulted from Code violations "within a reasonable degree of professional probability."   (Doc. 161-7 (henceforth, "Miller Deposition") at 285).   Asked to define that term, Miller stated that, "[b]asically, given my education, training, and experience, and the evidence that has been collected, it's the most probable correct answer.   So that means it's more likely than not."   (Miller Deposition at 201-02).

Miller offers no explanation – other than "education, training, and experience" – as to how he can conclude that it is more likely than not that any stucco cracks in Pulte-built homes were caused by one of the specified Code violations.   He concedes that even stucco installed in compliance with the Code can crack.   (Miller Deposition at 69).   He acknowledges that other

Code violations can cause stucco cracks, and that such violations can be found in homes of the putative class members.[10]   But he offers no objective basis for excluding these other potential causes.   He could not point to any tests that had been performed (on Pulte homes or otherwise) that led him to this conclusion or, indeed, any test that had been or could be performed to determine whether a particular crack was caused by one of the specified Code violations, or some other Code violation, or by something that was not a Code violation at all.   He could not point to any peer-reviewed studies that supported this conclusion.[11]

Per *Daubert*, when determining whether proposed expert testimony is reliable under Rule 702, the court is required to consider:   (1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community.   Based on this record, Miller's proposed testimony falls well short in each of these areas.   Miller has not proposed any method by which his causation theory can be tested; there is no evidence that it has been peer-reviewed or widely accepted; and even Miller suggests that his theory has an error rate of roughly 50 percent.   (Miller Deposition at 201-02).   The four factors are not intended to be exhaustive, but the Plaintiffs have not pointed to any other basis for this Court to find that Miller's causation theory is sufficiently reliable to be admissible.

---

[10]   For example, in his original report, Miller states that the damage observed at the Pulte-built homes was "consistent with the lath not being completely embedded in the stucco" and with "the stucco not being the proper thickness."   (Miller Report at 10).

[11]   Along the same lines, in their response to the instant motion, the Plaintiffs assert that, "in almost every case," the specified Code violations "culminate[] in visible cracking," while other Code violations "only exacerbate the damage."   (Doc. 177 at 1-2).   But the only citations provided in support of these assertions are to passages of other documents in the record where the Plaintiffs make similar (unsupported) arguments.

Miller repeatedly points to his "education, training, and experience" as the basis for the opinions he would provide in this case.   And Miller certainly has a great deal of experience with stucco installation and inspection.   However, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (internal quotation omitted).   The Committee Note to the 2000 Amendments of Rule 702 states that

> If the witness is relying solely or primarily on experience, then the witness must explain *how* that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed.R.Evid. 702 advisory committee's note (2000 amends.) (emphasis added).   Rather than merely asserting that he has a great deal of experience, Miller is obligated to "connect the dots" between that experience and his conclusions regarding causation, damages, and the like.   He has not done so.

Even if Miller's causation theory had adequate support, it would not be suited to a class action, particularly one of this (potential) magnitude.   Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury.   This does not mean merely that they have all suffered a violation of the same provision of law.   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (internal quotation omitted).   Rather, the plaintiffs' claims must depend upon a common contention, such as, in a Title VII case, allegations of discriminatory bias on the part of the same supervisor, *id.* at 350, or in this case, a discrete list of Code violations. But Miller's causation theory – that it is more likely than not that the cracks in any class member's home resulted from one of the specified violations – only applies in terms of a single home, not a group of homes.   To put it in different terms, Miller is not asserting that the cracks in *every* home

were caused by the Code violations in a single home.   Each home must be considered individually.

According to Miller's theory, if the Gazzaras' home has one or more of the specified Code violations, and cracks in the stucco, it is more likely than not that the cracks were caused by one of those violations.   And the same would hold true for the Whitmans' home: If it had one or more of the specified violations, and cracks, according to Miller's theory it is more likely than not that a specified violation caused the cracks.   "More likely than not" suggests at least a 51 percent chance of the expected outcome.   For purposes of illustration, if one were to assign a 70 percent likelihood to Miller's more-likely-than-not formulation, there would be a 70 percent chance that the cracks in the Gazzaras' home were caused by one or more of the specified Code violations, and a 70 percent chance that the cracks in the Whitmans' home were caused by one of the specified violations.   However, there would only be a 49 percent chance (.7 x .7) that the cracks in *both* Plaintiffs' homes were caused by one of those violations.   Add a third house to the group, and the likelihood that the cracks in all the houses were caused by one of the specified violations drops to 34.3 percent (.7 x. .7 x .7).   A fourth house in the group reduces the chance to 24 percent (.7 x .7 x. .7 x .7), 10 houses to 2.8 percent, and so on.

As should be obvious, even if one were to assume that Miller's causation theory is valid, and that all of the homes in the putative class have one of the specified Code violations and cracked stucco, the likelihood that the cracks in all 17,000-plus homes arise from Miller's theorized cause is infinitesimally small.

## B.    Remedy

Miller also opines as to the proper remedy for the alleged violations of Fla. Stat. §553.84. Specifically, Miller contends that the only proper remedy here is replacement of all of the stucco

affected by any of the specified Code violations[12] – as opposed to, for example, painting over hairline cracks or patching larger cracks.   (Doc. 193 at 45).   As with his causation theory, Miller was unable to point to any objective justification, such as test results or publications, for requiring total replacement of all affected stucco.   (Doc. 193 at 44-46).   Instead, he cited his "education, training, and experience"[13] as the basis for his opinion.   (Doc. 193 at 46).   As noted above, reliance on experience alone is insufficient to establish the reliability of proffered expert testimony.

At the hearing on this motion, Plaintiffs' counsel argued that Miller's recommended remedy was corroborated by another engineering firm – Hoy & Miller Consulting, LLC (henceforth, "Hoy & Miller") – that had been hired by Pulte to survey and evaluate stucco systems for compliance with applicable codes, industry standards and good workmanship standards.   In connection with that assignment, Hoy & Miller issued reports on numerous homes, which were admitted as Plaintiffs' Exhibits 7 and 8 at the hearing.   (Doc. 189-6 through 189-56).   Plaintiffs' counsel urged the Court, over Pulte's objection, to read the Hoy & Miller reports.   (Doc. 193 at

---

[12]   In his supplemental report, Miller only recommends replacement in homes where the stucco is in contact with dissimilar materials:

> All the Stucco Siding frame and frame over block homes that SEI observed that have Stucco Siding in contact with windows as the dissimilar material, and that have damage shall have the stucco over frame sections removed and replaced per the repair protocol set forth in Exhibit A of the Second Amended Complaint.

(Miller Supplement at 3).   However, in their papers and at the hearings, the parties proceeded on the basis that Miller had recommended replacement regardless of which Code violations were present in the home.

[13]   Miller also cited "the consensus in the industry of my peers," Doc. 193 at 46, but did not provide any evidence that his view as to the proper remedy is widely shared. For its part, the Defendant introduced evidence that others in the industry sometimes recommend repainting or repairing rather than replacement.   *See, e.g.*, Doc. 193 at 81.

77).   Plaintiffs' counsel contended that the Hoy & Miller reports corroborated Miller's opinion that each home in the putative class is defective because one or more of the specified Code violations has caused cracking, which requires removal and replacement of the entire stucco system.

The Court has reviewed these reports and they do not support Plaintiffs' position.

Plaintiffs' Exhibit 7 consists of reports on 50 homes where Hoy & Miller performed a visual condition survey of readily visible physical components of the stucco assembly and limited moisture probing in an attempt to identify the presence of elevated moisture at the wood sheathing. [14]   As set forth in these reports, Hoy & Miller discovered numerous problems, not just the two relied upon by Plaintiffs, including: missing wall weep screed; missing drip edge and head flashing; insufficient stucco coats and thickness; weak stucco; improper lath lap; insufficient fastener – length and spacing; missing sealant at accessory joints, roof flashing, and window perimeters; and incorrect installation of weather resistant barrier.

Based upon these observations, destructive testing, and moisture content readings, Hoy & Miller found that in 21 homes, the entire stucco assembly should be removed and replaced.   *See, e.g.,* Doc. 189-8 at 7.   However, with respect to the majority of these 50 homes, Hoy & Miller recommended "[l]imited destructive testing" to "evaluate the installation and operation of the stucco assembly in order to recommend a repair protocol."   *See e.g.* Doc. 189-7 at 10.[15]

---

[14]   Each of the Hoy & Miller reports states that stucco "is a cementitious material that is inherently weak in tension, and accordingly some cracking . . . is both typical and expected."   *See, e.g.,* Doc. 189-8 at 14.   Each report also contains this disclaimer: "Visual observation of physical components is inherently limited in that it does not identify discrepancies that are concealed." *See, e.g.,* Doc. 189-7 at 11.

[15]   The instant case involves only stucco over wood frame/sheathing.   The homes that Hoy & Miller found to require stucco removal were two-story homes with wood framing on the second floor over masonry block (henceforth, "CMU") on the first floor.   Thus, removal was required only on the second story.   Some of the homes were single-story CMU construction with no wood

In sum, with respect to Plaintiffs' Exhibit 7, Hoy & Miller noted numerous deficiencies that could contribute to stucco cracking, and recommended complete removal and replacement in less than half of these homes – and only after moisture probing and destructive testing indicated that removal was necessary.   Contrary to Plaintiffs' contention, these reports do not support Miller's opinion that the mere visual observation of one of the specified Code violations requires complete stucco removal.

Plaintiffs' Exhibit 8 (Doc. 189-56) is a list of 45 homes in Windermere, inspected in October 2016, where Hoy & Miller recommended removal of the entire second floor stucco assembly.   Plaintiffs' counsel relies on these documents to support Miller's opinion that these deficiencies can be detected by visual observation only, contending that Hoy & Miller used the same "visual only" methodology.   (Doc. 193 p. 32).   However, the Hoy & Miller report attached to Exhibit 8 reflects that the firm's observations included not just visual observation, but "limited moisture probing" and "limited destructive testing."   (Doc. 189-56 at 5).   Thus, counsel's reliance on Exhibit 8 to support the notion that Hoy & Miller used the same methodology as Mr. Miller is misplaced.

In addition, Miller's recommendation runs afoul of Florida's economic waste doctrine. Under Florida law, the proper measure of damages for defective construction is either

> the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

> the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in

---

frame or with wood only at the gables.   According to Hoy & Miller's reports, cracking on these homes was generally limited to hairline cracks described as "maintenance level" that could be repaired without removal.   *See, e.g.,* Doc. 189-45 at 7-8.

accordance with the contract would involve unreasonable economic waste.

*Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1039 (adopting subsection 346(1)(a) of the Restatement (First) of Contracts (1932) regarding damages for breach of a construction contract).   The only evidence in the record as to the cost of replacing stucco is the report of Jeffrey Randazzo of Randazzo Builders, Inc., who states (on behalf of the Plaintiffs) that his company would be willing to perform the work for $53.97 per square foot.   (Doc. 143-8).   The Plaintiffs have made no showing that this cost does not constitute unreasonable economic waste when compared to cheaper alternatives such as painting and patching of cracked areas, and as such they have not shown that replacement would be the proper remedy.

### IV.    Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion to Exclude the Testimony of Thomas E. Miller (Doc. 167) is **GRANTED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 3, 2017.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party